**J.D. LANDSCAPING, Petitioner**

v.

**WORKERS' COMPENSATION AP-PEAL BOARD (HEFFER-NAN), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 18, 2011.

Decided Dec. 2, 2011.

Ryan S. Zavodnick, Philadelphia, for petitioner.

Vasil L. Kirifides, Media, for respondent Casey Lynn Heffernan.

BEFORE: LEADBETTER, President Judge, and BROBSON, Judge and KELLEY, Senior Judge.

OPINION BY Judge BROBSON.

J.D. Landscaping (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board), dated August 13, 2010. The Board affirmed the decision of a Workers' Compensation Judge (WCJ), which granted the fatal claim petition of Casey Lynn Heffernan (Claimant) requesting benefits as a result of the death of her father, James Heffernan (Decedent). For the reasons that follow, we affirm the Board.

Decedent injured his lower back while working for Employer on July 12, 2002. On July 26, 2002, Employer issued a temporary notice of compensation payable (TNCP) recognizing Decedent's injury as a "lower back strain." (WCJ's Decision at 3.) The TNCP was converted to a notice of compensation payable (NCP) on October 22, 2002, and the description of injury in the NCP was later expanded to include a herniated disc at L4–5. (*Id.*)

On March 5, 2006, Employer filed a utilization review (UR) request, challenging the reasonableness and necessity of all treatment provided to Decedent by George L. Rodriguez, M.D., on or after February 15, 2007. (Reproduced Record (R.R.) at 124a.) By UR determination issued June 4, 2007, Richard S. Kaplan, M.D., concluded that all treatment provided by Dr. George Rodriguez, including prescriptions for Sonata, Fentanyl, Oxycodone, Fentora, Docusate, and Lyrica, was neither reasonable nor necessary "from February 15, 2007 and into the future." (*Id.* at 128a–29a.) Dr. George Rodriguez petitioned for review of the UR determination, however, that petition was later withdrawn. (WCJ's Decision at 3.)

On November 17, 2007, Claimant filed a fatal claim petition against Employer, alleging that Decedent died of multiple drug intoxication on June 18, 2007. (*Id.*) Employer filed an answer on December 5, 2007, denying the material allegations in

Claimant's fatal claim petition, and the matter was assigned to the WCJ. (*Id.*) On October 28, 2008, the parties executed a joint stipulation of facts, which provides, in pertinent part:

2. It is agreed and stipulated that on 07/12/2002, [Decedent] suffered injuries to his low back, including a herniated disc at L4–5, while within the course and scope of his employment.

. . . .

4. It is agreed and stipulated that [Decedent] died on June 18, 2007 as a result of multiple drug intoxication . . . .

5. It is agreed and stipulated that [Decedent] had one dependent at the time of his death, [Claimant].

6. It is agreed and stipulated that [Decedent] died from prescription drugs prescribed for him as result of his work injury, however, Employer was not responsible for the payment of those drugs from February 15, 2007 and ongoing into the future based upon the June 4, 2007 Utilization Review Determination of Dr. Richard S. Kaplan . . . .

7. It is agreed and stipulated that [Decedent] died as result of an accidental overdose, primarily [F]entanyl, in excess of the amount prescribed for him for his work injury . . . .

(R.R. at 108a–09a (footnote omitted).)

Attached to the joint stipulation of facts was the Delaware County Medical Examiner's postmortem report, toxicology report, and investigator's report. (R.R. at 111a–20a.) The WCJ summarized the Delaware County Medical Examiner's reports as follows:

a. An investigative report from the County of Delaware Office of Medical Examiner dated June 19, 2007 indicates on June 18, 2007, a family member came to Decedent's resident [sic] to check on his well being and found him unrespon-

sive in bed. EMS was called. EMS noted that he was asystole and cold, with a box of Fentanyl patches in his hand and pink froth coming from his mouth. His past medical history was recorded as back problems for which he was taking Fentanyl, Oxycodone and several other pain medications. His last medical doctor was recorded as Daisy Rodriguez. An investigator from the Medical Examiner's Office was called and thereafter, reported to the scene. Decedent's body and the surrounding scene were examined. Decedent was in bed, holding Fentanyl instructions in his right hand. The television, light and fan were on in the bedroom. Several prescription medications were found on a cart in the bedroom. They included Fentanyl, Carisoprodol, Lyrica, Nexium, Sonata, Oxycodone, Lexapro, Actoplus, Cyclobenzaprine and Docusate. All appeared to be in order, but the Fentanyl—filled June 16, 2007 for 12 patches with four remaining and Hydrocodone— filled May 27, 2007 for 120 found empty. Decedent's body, the Fentanyl patches and the empty Hydrocodone bottle filled [sic] were taken to the Medical Examiner's Office.

b. On Judge [sic] 19, 2007, a complete autopsy was performed by the County of Delaware Office of the Medical Examiner and a Postmortem Report was completed indicating that the cause of death was multiple drug intoxication. By history, the Decedent had a past medical history of back problems and he was taking multiple medications for the back pain. His death was determined to be accidental.

c. A toxicology report issued on July 6, 2007, indicated that six sealed containers were received on June 22, 2007. This report noted findings consistent [sic] consumption of less than one alcoholic drink; Propoxyphene, which is synthetic narcotic analgesic, frequently compound-

ed with non-narcotic analgesics; Oxycodone, a narcotic analgesic, often compounded with other ingredients such as non-narcotic analgesics; Fentanyl, a potent, synthetic narcotic analgesic.

(WCJ's Decision at 4–5.)

Also attached to the joint stipulation of facts was a report by Ian C. Hood, MB, ChB, forensic pathologist. (R.R. at 134a– 35a.) The WCJ summarized Dr. Hood's report, in part, as follows:

On June 18, 2007, Decedent was found dead, with a box of Fentanyl transdermal delivery patches that had been prescribed for him two days before, to be applied at no more than one every two days, but eight patches were missing. On June 19, 2007 an autopsy was performed. Subsequent toxicology reports revealed that Fentanyl alone was sufficient to account for death, in even a tolerant user, as Decedent was [sic] certainly was. Decedent died from drug intoxication due to an overdose of Fentanyl prescribed for his work injury.

(WCJ's Decision at 5–6.)

At the hearing before the WCJ, Employer presented the testimony of Dr. George Rodriguez. Dr. George Rodriguez testified that he is board certified in pain medicine. (R.R. at 44a.) Dr. George Rodriguez explained that he is the sole owner of George L. Rodriguez, M.D., P.C., and that his sister, Dr. Daisy Rodriguez, M.D., is the only other physician in the practice. (*Id.* at 14a, 16a.) Dr. George Rodriguez testified that he began treating Decedent in July 2002, and that he developed Decedent's medical plan of care. (*Id.* at 24a, 29a.) Dr. George Rodriguez explained that he is familiar with the UR process and that he was aware of the June 4, 2007 UR determination concluding that his treatment of Decedent was neither reasonable nor necessary from February 15, 2007 onward. (*Id.* at 22a, 24a–25a.) Dr.

George Rodriguez continued to treat Decedent from February 15, 2007, to June 14, 2007. (*Id.* at 26.) During that time period, Dr. Daisy Rodriguez treated Decedent on two occasions. (*Id.*) Dr. George Rodriguez explained that Dr. Daisy Rodriguez was free to disagree with and make changes to Decedent's plan of care as she saw fit, but that she did not do so. (*Id.* at 30a–31a.)

Dr. George Rodriguez testified that he saw Decedent for an office visit on June 14, 2007, and that he prescribed the following medications for Decedent's work-related injury: Actiq, 800 mcg (Fentanyl lozenge), once a day; Duragesic (Fentanyl patch), 50 mcg and 100 mcg in combination, once every other day; Fentora (Fentanyl tablet) 800 mcg, three times a day; Ambien, 10 mg, as needed for sleep; Colace, 100 mg, two times a day; Lyrica, two times a day; and Oxy IR (Oxycodone tablet), 5 mg, every four hours as needed. (*Id.* at 41a–43a, 213a–14a.) These prescriptions were sent to Summit Pharmacy, a mail-order pharmacy, but Summit Pharmacy refused to fill them. (*Id.* at 51a–53a.) Dr. George Rodriguez could not state whether Summit Pharmacy's refusal was based upon the June 4, 2007 UR determination. (*Id.* at 54a.) Dr. George Rodriguez testified that he did not write Decedent additional prescriptions after June 14, 2007, but that Dr. Daisy Rodriguez saw Decedent on June 16, 2007. (*Id.* at 57a–59a.) Dr. George Rodriguez explained that Decedent's June 16, 2007 visit was prompted by the fact that Decedent could not fill his prescriptions, and that Dr. Daisy Rodriguez was free to prescribe whatever treatment she felt appropriate. (*Id.* at 58a–61a.)

Employer also presented the testimony of Dr. Daisy Rodriguez. Dr. Daisy Rodriguez testified that Dr. George Rodriguez was Decedent's primary treating physician, but that she was Decedent's treating physician on the dates that she saw him. (*Id.* at 73a–74a.) Dr. Daisy Rodriguez explained that she has some familiarity with the UR process and that she was aware that Decedent's treatment was subject to the June 4, 2007 UR determination when she saw Decedent on June 16, 2007. (*Id.* at 74a–80a.) Dr. Daisy Rodriguez testified that she visited Dr. George Rodriguez at his home on June 15, 2007, at which time Dr. George Rodriguez received a telephone call from Decedent. (*Id.* at 80a–81a.) Dr. George Rodriguez informed Dr. Daisy Rodriguez that Summit Pharmacy would not fill Decedent's prescriptions because of the June 4, 2007 UR determination and asked Dr. Daisy Rodriguez to see Decedent to "handle" the situation. (*Id.* at 81a–82a.) Dr. Daisy Rodriguez then got on the phone with Decedent and scheduled an appointment for June 16, 2007. (*Id.* at 83a–84a.) On June 16, 2007, Dr. Daisy Rodriguez briefly examined Decedent and determined "that this was purely just an issue of replacing prescriptions." (*Id.* at 84a–85a.) Although Dr. Daisy Rodriguez could not state with certainty the specific prescriptions she wrote for Decedent on June 16, 2007, Dr. Daisy Rodriguez testified that she felt the prescriptions written by Dr. George Rodriguez on June 14, 2007, were appropriate for Decedent's medical condition and that it was not her intention to alter Dr. George Rodriguez's treatment in any way. (*Id.* at 95a–97a.)

By order issued October 8, 2009, the WCJ granted Claimant's fatal claim petition, finding that "Decedent's death was causally related to an accidental overdose of pain medications, primarily Fentanyl based medications, which were prescribed for Decedent's work related back injury of July 12, 2002." (WCJ's Decision at 10.) The WCJ further found that the pain medications on which Decedent overdosed "were prescribed by Dr. Daisy Rodriguez for [Decedent's] work related back injury."

(*Id.*) In so determining, the WCJ found credible the testimony of Dr. George Rodriguez, the testimony of Dr. Daisy Rodriguez, and the reports of the Delaware County Medical Examiner's Office and Dr. Hood. (*Id.* at 9.)

The WCJ also addressed the import of the June 4, 2007 UR determination:

17. The Judge finds that Dr. George Rodriguez' treatment, including office visits, medications, and medical supplies was found to be neither reasonable nor necessary, as documented by the June 4, 2007 UR Determination and further, that this Determination is final since it was not appealed.

18. The Judge finds that the treatment of Dr. Daisy Rodriguez' [sic] was never the subject of a Request for Utilization Review.

. . . .

21. The Judge finds that the June 4, 2007 UR Determination concerns only the treatment rendered to Decedent by Dr. George Rodriguez and has no bearing on the treatment rendered to Decedent for his work injury by Dr. Daisy Rodriguez which was never the subject of a utilization review request.

(*Id.* at 9–10.) The WCJ further found that "[n]either Dr. George Rodriguez nor Dr. Daisy Rodriguez scheduled their visits and treatment of patients with the intent to get around a UR Determination," and that "Dr. Daisy Rodriguez was free to agree or disagree with Dr. George Rodriguez' plan of care and rendered whatever treatment she felt was appropriate given Decedent's complaints and his clinical presentation." (*Id.* at 7, 9.)

Employer appealed to the Board, arguing that the WCJ erred in granting Claimant's fatal claim petition because Decedent died as a result of an accidental overdose of prescription pain medications found by the June 4, 2007 UR determination to be neither reasonable nor necessary. (Board's Opinion at 3.) By order dated August 13, 2010, the Board affirmed the WCJ's decision. Finding that the June 4, 2007 UR determination applied only to treatment rendered by Dr. George Rodriguez, the Board concluded that the June 4, 2007 UR determination was not dispositive because Dr. Daisy Rodriguez, not Dr. George Rodriguez, prescribed the medications that caused Decedent's death. (*Id.* at 5–6.) This petition for review followed.

On appeal,[1] Employer argues that the Board and the WCJ erred in determining that Dr. Daisy Rodriguez' treatment is not subject to the June 4, 2007 UR determination. Although Employer acknowledges that UR determinations are provider specific, *see Schenck v. Workers' Compensation Appeal Board (Ford Electronics)*, 937 A.2d 1156 (Pa.Cmwlth.2007), Employer maintains that the June 4, 2007 UR determination should nevertheless apply to Dr. Daisy Rodriguez' treatment in this instance because Dr. Daisy Rodriguez wrote prescriptions identical to those issued by Dr. George Rodriguez two days earlier, at Dr. George Rodriguez' request, and with knowledge that Dr. George Rodriguez' treatment of Decedent was subject to the June 4, 2007 UR determination. In turn, based on the proposition that a favorable UR determination obviates an employer's obligation to pay not only for the subject medical treatment, but also for any resultant effects of said medical treatment, Employer argues that the Board and the WCJ erred in granting Claimant's fatal claim petition because Decedent's death resulted from an accidental overdose of prescription

---

1. This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are support by substantial evidence. 2 Pa.C.S. § 704.

pain medications deemed by the June 4, 2007 UR determination to be neither reasonable nor necessary. Regardless of whether the June 4, 2007 UR determination applies to Dr. Daisy Rodriguez' treatment, we disagree that the Board and the WCJ erred in granting Claimant's fatal claim petition.

In a fatal claim proceeding, the surviving family member bears the burden of proving that the decedent sustained an injury in the course and scope of employment and that the decedent's death was causally related to the work-related injury. *Whelan v. Workers' Comp. Appeal Bd. (F.H. Sparks Co. of Pa.),* 110 Pa.Cmwlth. 242, 532 A.2d 65, 66 (1987). Where a decedent's death results from medical treatment received for a work-related injury, the law regards the decedent's death as having been caused by the work-related injury. *Powell v. Sacred Heart Hosp.,* 99 Pa.Cmwlth. 575, 514 A.2d 241, 243–44 (1986). Claimant's burden, therefore, was to show that Decedent died as a result of medical treatment that was provided to treat Decedent's work-related injury.

Here, based upon the parties joint stipulation of facts and its attachments, and the testimonies of Dr. George Rodriguez and Dr. Daisy Rodriguez, all of which the WCJ found to be credible and persuasive, the WCJ found that Decedent's death resulted from an accidental overdose of pain medications that Dr. Daisy Rodriguez prescribed to treat Decedent's July 12, 2002 work-related injury. "The law is well settled that the WCJ, as fact finder, has exclusive power over questions of credibility and evidentiary weight, that the WCJ may reject the testimony of any witness in whole or in part, and that such determinations are not subject to appellate review." *Potere v. Workers' Comp. Appeal Bd. (Kemcorp),* 21 A.3d 684, 690 (Pa.Cmwlth.2011). In arguing that the Board and the WCJ nevertheless erred in

granting Claimant's fatal claim petition because of the June 4, 2007 UR determination, Employer contends, in essence, that there can be no causal relationship between a decedent's death and a work-related injury where a decedent dies as a result of medical treatment deemed by a UR determination to be neither reasonable nor necessary. Employer misconstrues the import of a UR determination.

The UR process is set forth in Section 306(f.1)(6) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 531(6), and the regulations found at 34 Pa.Code §§ 127.401–.556. Section 306(f.1)(6) of the Act provides, in pertinent part:

(6) [D]isputes as to reasonableness or necessity of treatment by a health care provider shall be resolved in accordance with the following provisions:

(i) The reasonableness or necessity of all treatment provided by a health care provider under this act may be subject to prospective, concurrent or retrospective utilization review at the request of an employe, employer or insurer. The department shall authorize utilization review organizations [ (UROs) ] to perform utilization review under this act. Utilization review of all treatment rendered by a health care provider shall be performed by a provider licensed in the same profession and having the same or similar specialty as that of the provider of the treatment under review. Organizations not authorized by the department may not engage in such utilization review.

The regulation found at 34 Pa.Code § 127.406, in turn, establishes the scope of the URO's review:

(a) UROs shall decide *only* the reasonableness or necessity of the treatment under review.

(b) UROs *may not* decide any of the following issues:

(1) *The causal relationship between the treatment under review and the employe's work-related injury.*

(Emphasis added.) Finally, the regulation found at 34 Pa.Code § 127.470 explains the URO's duties in reviewing the disputed medical treatment:

(a) Reviewers shall decide *only* the issue of whether the treatment under review is reasonable or necessary for the medical condition of the employe.

(b) *Reviewers shall assume the existence of a causal relationship between the treatment under review and the employe's work-related injury.* Reviewers may not consider or decide issues such as whether the employe is still disabled, whether maximum medical improvement has been obtained, quality of care or the reasonableness of fees.

(Emphasis added.)

Interpreting the above quoted language, this Court has recognized that the issue of causation is separate and distinct from the reasonableness and necessity of medical treatment. *See Corcoran v. Workers' Comp. Appeal Bd. (Capital Cities/Times Leader),* 725 A.2d 868, 870–72 (Pa.Cmwlth. 1999); *Hoffmaster v. Workers': Comp. Appeal Bd. (Senco Prods., Inc.),* 721 A.2d 1152, 1154–55 (Pa.Cmwlth.1998); *Warminster Fiberglass v. Workers' Comp. Appeal Bd. (Jorge),* 708 A.2d 517, 519–20 (Pa. Cmwlth.1998); *Bloom v. Workmen's Comp. Appeal Bd. (Keystone Pretzel Bakery),* 677 A.2d 1314, 1317–18 (Pa.Cmwlth.), *appeal denied,* 546 Pa. 657, 684 A.2d 558 (1996). In *Corcoran,* this Court addressed, in the context of a termination petition, whether a UR determination concluding that the claimant's physical therapy treatments were reasonable and necessary precluded the WCJ's finding that the claimant had fully recovered from his work-related injury. Holding that the UR determination was irrelevant, we reasoned:

The ... regulations clearly limit the URO's role to deciding the issue of reasonableness and necessity of medical treatment, and unambiguously exclude from the URO's scope of review the issues of whether medical treatment is causally related to a workplace injury and whether a claimant is disabled. Questions of causation must be decided by a[WCJ] and not by a URO.

. . . .

Because the scope of review of a URO is strictly limited to reviewing the reasonableness and necessity of medical treatment, the URO's decision that the physical therapy provided to Claimant was reasonable and necessary does not establish that the treatment was causally related to Claimant's work-related injury or that Claimant remains disabled by his *work-related* injury.... These critical questions of causation and disability were within the exclusive province of the WCJ to resolve, and not the URO. For that reason, the WCJ's findings that Claimant's work-related disability ceased and that any remaining disability was the result of a non-work-related condition cannot be affected by the URO's determination. Hence, the URO report is irrelevant to the issues presented in the Employer's termination petition.

*Corcoran,* 725 A.2d at 871 (emphasis in original) (citations omitted).

Likewise, in *Hoffmaster,* this Court addressed, in the context of a review medical treatment petition, whether a UR determination concluding that the claimant's rheumatological treatment was reasonable and necessary precluded the WCJ's finding that claimant's rheumatological treatment was not casually related to claimant's work-related injury. Holding that the UR

determination did not preclude the WCJ's finding, we reasoned:

> [T]his Court has acknowledged that UROs have the authority to decide only the reasonableness or necessity of the treatment at issue. They have no jurisdiction, however, over either the causal relationship between the treatment under review and the employee's work-related injury or the issue of whether the employee is still disabled. Thus, the February 7, 1995 URO determination could only have determined whether Dr. Roumm's rheumatological treatment was reasonable and necessary. The URO could not have determined whether Dr. Roumm's rheumatological treatment of Claimant was causally related to Claimant's work injury. Thus, the URO's determination that Dr. Roumm's treatment of Claimant was reasonable and necessary could not have a preclusive effect on the WCJ's determination regarding the different and discrete issue of whether such treatment was causally related to Claimant's compensable work-related injury. Accordingly, the WCJ was not precluded from determining that Dr. Roumm's treatment was not causally related to Claimant's work injury.

*Hoffmaster*, 721 A.2d at 1155 (citations and footnotes omitted).

Thus, under the above cited cases, the June 4, 2007 UR determination, which concerns only reasonableness and necessity, is irrelevant in determining whether Decedent's death was causally related to Decedent's work-related injury. The Board, therefore, did not err in granting Claimant's fatal claim petition.

Accordingly, we affirm the decision of the Board.

### ORDER

AND NOW, this 2nd day of December, 2011, the order of the Workers' Compensation Appeal Board, dated August 13, 2010, is hereby AFFIRMED.